IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JOYCE ELLEBY,

     Plaintiff,

vs.                            CASE NO. 1:13-cv-131-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

     Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying Plaintiff's applications for a period of disability,

disability insurance benefits (DIB), and supplemental security income (SSI).  Doc. 1.

The Commissioner has answered, Doc. 9, and both parties have filed briefs outlining

their respective positions.  Docs. 16, 17.  For the reasons discussed below, the

Commissioner's decision should be affirmed.

## I. PROCEDURAL HISTORY

     Plaintiff applied for a period of disability, DIB, and SSI on June 10, 2009, alleging

disability since July 1, 2008.  (R. 103-06.)   Her applications were denied initially and

upon reconsideration.  (R.107-29.)  A hearing was held before an Administrative Law

Judge (ALJ) on March 11, 2011.  At the hearing Plaintiff, a medical expert, and a

vocational expert (VE) testified.  (R. 36-94.)  The ALJ denied Plaintiff's claims in a

decision dated June 16, 2011, finding that although Plaintiff suffered from the severe

impairments of history of morbid obesity, hyperlordosis of the lumbar spine exacerbated

by obesity, and degenerative/osteoarthritis of the knee made symptomatic by her

obesity, she was not disabled by her impairments.  (R. 18-28.)  The Appeals Council

denied Plaintiff's request for review, rendering the ALJ's decision the Commissioner's

final decision.  (R. 1-4.)  On July 12, 2013, Plaintiff filed the instant appeal to this Court.

Doc. 1.  On appeal, Plaintiff raises three issues: (1) whether the ALJ fully developed the

record to determine whether she met Listing 1.02;  (2) whether the ALJ erred in

assessing the effects of Plaintiff's obesity; and (3) whether Plaintiff's right to a fair

hearing was violated because the ALJ was not a neutral factfinder.  Doc. 16.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1]  Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

taking into account evidence favorable as well as unfavorable to the decision.[4]

However, the district court will reverse the Commissioner's decision on plenary review if

the decision applies incorrect law, or if the decision fails to provide the district court with

sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment that can be

expected to result in death, or has lasted or can be expected to last for a continuous

period of not less than twelve months.[6]  The impairment must be severe, making

Plaintiff unable to do his previous work, or any other substantial gainful activity which

exists in the national economy.[7]

The burden of proof regarding the plaintiff's inability to perform past relevant

work initially lies with the plaintiff.[8]  The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

currently exists in the national economy.[9]  The Commissioner may satisfy this burden

---

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[9] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In  practice,  the  burden  temporarily  shifts  at  step  five  to  the  Commissioner.  The

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[10]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[11]   In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[12]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[13]   Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[14]   Only after the Commissioner meets this burden

---

Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[10] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[11] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[12] Walker, 826 F.2d at 1003.

[13] Wolfe, 86 F.3d at 1077-78.

[14] See id.

does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III.  <u>SUMMARY OF THE RECORD</u>

### A. <u>Medical Record Evidence</u>

Although Plaintiff's medical records are somewhat sparse, because Plaintiff's arguments on appeal focus on the effects of her obesity and its impact on her osteoarthritis, spinal disorders and related pain, the Court's summary will focus on the medical records that are relevant to those impairments.

On December 13, 2008 consultative physician Dr. Eftim Adhami examined Plaintiff.  He observed that Plaintiff was severely obese but her straight leg testing was normal bilaterally, her joints were free in all movement, and she retained the ability to pick up small objects despite her broken wrist as a teenager. Dr. Adhami further noted that although Plaintiff's right wrist had a deformity from the previous fracture that required her to use a wrist brace, she retained full range of motion.  He reported that Plaintiff's muscle strength was 5/5 in all muscles, she had a full range of motion in her back and knees, and her walk on toes and heels and tandem walk was normal.   Dr. Adhami also found that Plaintiff had hyperlordosis of the lumbar spine, which he stated was a common finding in young women "but the severe obesity makes this kind of back hurt."  He diagnosed Plaintiff with very severe obesity, mild osteoarthritis in her knees exacerbated by her obesity, and chronic back strain exacerbated by her obesity.  He also stated that she needed an x-ray of her wrist.  (R. 291-292.)

 On December 31, 2009, state agency physician Nicolas Bancks, M.D., opined

that Plaintiff retained the ability to lift/carry 10 pounds occasionally and frequently;

stand, and/or walk at least two hours in an eight-hour workday, sit for six hours during

an eight-hour workday; and perform unlimited pushing and/or pulling consistent with her

lifting/carrying abilities.  He also opined that Plaintiff could perform all postural activities

occasionally, and should avoid concentrated exposure to hazards such as machinery

and heights.  Plaintiff's history revealed no manipulative, visual, or communicative

limitations.  Dr. Bancks specifically stated that Plaintiff was suffering from "truly

profound obesity," which was "fully allowed for" in his assessment.  (R. 295-303.)

Plaintiff returned to Dr. Adhami on September 5, 2009.  She reported pain in

both her knees, and low back pain without radiation.  Plaintiff said her pain had been

there for the past two years, and her pain was generally worse in the morning.  Dr.

Adhami noted that Plaintiff's muscle strength remained 5/5 in all muscles, and her joints

were free in all movement, without signs of inflammation or fluid.  Despite the

hyperlordosis of the lumbar spine, Plaintiff retained full range of motion but reported

pain in deep flexion.  Her knees also had full range of motion, with mild crepitation and

clicks and pain in full extension bilaterally. Dr. Adhami noted that in Plaintiff's right wrist

there was bulging of the styloid process of the ulna Plaintiff  still had full range of motion

and the function of her hand was preserved. Plaintiff's walk was normal, her walk on

heels and toes was normal, and tandem walk was normal.  Dr. Adhami diagnosed

Plaintiff with mild arthritis of the lumbar spine joints exacerbated by obesity,

degenerative arthritis of the knees made symptomatic by obesity, deformity of the right

wrist due to her previous fracture, and obesity.  (R. 305-06.)

Plaintiff was examined by consultative physician Dr. Robert A. Greenberg on February 22, 2010.  Dr. Greenberg noted that there was decreased range of motion in Plaintiff's knees, hips, and lumbar spine.  He also noted decreased strength in both of her legs, for a 4/5.  He noted pain on palpation and range of motion of both knees, although the right knee was worse than the left.  He stated that no other evidence for active, inflammatory arthritis was present. Dr. Greenberg stated that there was positive straight leg raising pain bilaterally at thirty degrees, and that Plaintiff walked with a waddling gait due to her obesity, but did not require any assistance in ambulation. Plaintiff was unable to tandem walk, could not walk on her heels or toes, and was unable to stoop.   Dr. Greenberg diagnosed Plaintiff with severe osteoarthritis of the lumbar spine, hips, and knees aggravated by her morbid obesity. ( R. 314-15.)

Plaintiff received an x-ray of her right knee on April 8, 2010.  It showed advanced medial compartmental joint space narrowing with subchondral sclerosis and osteophyte formation.  The lateral and patellofemoral joint spaces, however, were preserved, and there was no definite joint effusion, fracture or destructive lesion.  (R. 319.)

On March 1, 2010, state agency physician Donald Morford, M.D., opined that Plaintiff retained the ability to lift/carry 10 pounds occasionally and frequently; stand and/or walk for two hours in an eight-hour workday, and sit for six hours during an eight-hour workday.  He opined that Plaintiff had limited ability to perform pushing and/or pulling in her lower extremities, relying on Dr. Greenberg's report of her decreased strength and range of motion in her knees, hips and lumbar spine, and also the x-ray of her right knee.  Dr. Morford opined that Plaintiff should be limited to climbing ramps,

and stairs occasionally, and never climbing ladders, ropes, or scaffolds.  He further

opined that she should also be limited to occasional balancing, stooping, kneeling,

crouching and crawling.  Plaintiff's history revealed no manipulative, visual, or

communicative limitations.  Dr. Morford also opined that Plaintiff should avoid

concentrated exposure to vibrations and hazards, but otherwise had no environmental

restrictions.  Dr. Morford noted that Plaintiff's "allegations appear to be slightly

embellished," and that weight loss should help.  (R. 320-327.)

Dr. Greenberg completed an RFC evaluation of Plaintiff on March 6, 2011, more

than a year after he examined Plaintiff.  The RFC assessment form was provided to him

by Plaintiff's counsel.  In the assessment, Dr. Greenberg opined that Plaintiff could sit

and work for up to thirty minutes at one time, and could work seated for a total of one

hour per day, five days a week.  He further opined that she could stand for thirty

minutes at one time, and could work at a job that required her to stand for a total of one

hour a day, five days a week.  He also opined that Plaintiff could work for a total of one

hour a day, five days a week at a job with a sit/stand option, and could lift frequently

and occasionally one to five pounds.  Dr. Greenberg explained that he based his

opinion on his findings of Plaintiff's decreased range of motion in her hips, knees, and

lumbar spine, as well and her decreased strength in her hips and unsteady gait.  (R.

334-337.)

Plaintiff began to treat with the Alachua County Health Department on May 6,

2010.  She stated to Dr. Boules, her treating physician, that she had not seen a doctor

in ten years.  She reported knee and back pain, and that she had been using over the

counter medication, but that it had not been much help.  Dr. Boules noted that there was no hotness or swelling in her knees, and only mild tenderness and subjective pain with movement.  Her back was also tender.  Dr. Boules recommended Tylenol Extra Strength, and if that did not help would consider prescription medication.  She recommended that Plaintiff follow up with lab work.

Plaintiff returned on May 20, 2010 to check on her lab tests, and Dr. Boules counseled her on diet and exercise.  On June 3, 2010, Plaintiff returned and stated that while she felt better, her knees still hurt.  Dr. Boules again noted no hotness, redness, or swelling, and prescribed Tramadol for her pain.  Plaintiff returned on July 2, 2010 for a refill of her diclofenac, which she stated helped her.  Dr. Boules gave her a refill and again counseled her on diet and exercise. On July 16, 2010, Plaintiff had a complete physical, where it was noted that her hypertension was poorly controlled.  Her next appointment was on December 17, 2010, during which Dr. Boules educated her on the importance of medication compliance.  (R. 338-353.)

## B.  Hearing Testimony

A board-certified internist with a sub-specialty in rheumatology, Dr. Robert Karsh, M.D., testified as a medical expert at the hearing at the ALJ's request.  Dr. Karsh reviewed Plaintiff's medical records.  He noted that Plaintiff was overweight, had pain in her low back and leg, and had some difficulty getting around because of her ailments.  Dr. Karsh analyzed Listing 1.02, major dysfunction of a joint to see whether it might apply to Plaintiff.  He noted that Plaintiff had significant osteoarthritis in the right knee,

but observed that Plaintiff had not needed any assistance in ambulation, and thus did

not meet the Listing.  Dr. Karsh point to Plaintiff's medical records that her physicians

had previously found good ability to walk, no weakness, and a normal range of motion.

Dr. Karsh  also noted Plaintiff's February 22, 2010 examination, which showed

Plaintiff had gained weight, had a decreased range of motion in the hips and lumbar

spine, her strength was deceased to four out of five, and her gait was waddling.  He

noted that there was positive straight leg raising, but stated that it was unclear how the

test had been performed– whether supine or sitting.  He also noted the absence of any

lumbar spine x-rays.  Dr. Karsh finally opined that there was a possibility, with Plaintiff's

weight, that Plaintiff could equal Listing 1.04, but not without a lumbar spine x-ray, and

that she did not in any way meet or equal the listing as of December 13, 2008.  He also

noted that there was no explanation in Plaintiff's medical records for the drastic

difference between her prior examinations and the later examination performed by Dr.

Greenberg, whose letterhead indicated that he was a pulmonologist.  (R. 37-54.)

Dr. Karsh testified that Plaintiff occasionally could carry twenty pounds and

frequently handle ten pounds.  Taking into account Plaintiff's obesity under Social

Security Ruling 02-1P, Dr. Karsh opined that Plaintiff could stand and sit for six hours in

an eight-hour day, based on her earlier examinations.  He stated that using her later

examinations, she could stand and sit two hours in an eight-hour day.  He found no

limitations with her weight limits for pushing and pulling, and did not believe Plaintiff

had any limitation on her ability to reach in all directions, handle, finger, and feel either

from a fine or gross exterior standpoint within the weight limitations.  He further stated that Plaintiff should never climb ropes, ladders, or scaffolds.  He found that Plaintiff occasionally could climb ramps and stairs, balance, stoop, and kneel. Dr. Karsh clarified that Plaintiff should be limited to no hazards, including no exposure to concentrated vibration, work at unprotected heights, or around dangerous machinery.  Dr. Karsh specifically stated that he took into account Plaintiff's morbid obesity in determining her RFC.  (R. 54-57.)

During cross- examination by Plaintiff's representative, Dr. Karsh stated that although Dr. Greenberg made a finding that Plaintiff suffered from severe osteoarthritis of the lumbar spine, hips, and knees, aggravated by morbid obesity, there was "no basis" for mentioning osteoarthritis of the spine or the hips.  Plaintiff's representative suggested that the ALJ followup with an interrogatory to Dr. Greenberg, but the ALJ stated that he did not think it would accomplish much because Dr. Adhami also had examined Plaintiff.  (R. 57-63.)

Plaintiff testified that she was forty-eight years old at the time of the hearing, and had completed high school.  She had a driver's license, but was not driving regularly because she did not have a vehicle.  Plaintiff had last worked at Sonny's Barbeque as a salad bar clerk, for nine and a half years, until 2008.  She stated that she had to be on her feet or walking most of her work day, and normally would only have to carry four or five pounds, when she would carry salad bowls to restock the salad bar.  She also worked in the kitchen helping to cut up vegetables.  She testified that she left her job

because of the pain in her legs walking back and forth, and bending her back, and she could not sit down.  She said that she could no longer do the job and so she quit and therefore was not eligible to get unemployment.  (R. 63-70.)

At that time Plaintiff left her job she was not under the care of a doctor because she did not have insurance.  She started going to the health department about a year after she left her job, and reported that her knees and back were giving her problems. The health department examined Plaintiff, but did not refer her for x-rays or testing because of her lack of insurance.  Plaintiff stated that she was seeing the public health department every three months for medication refills, and she was going once a month to check on her cholesterol and high blood pressure.  She stated that she saw Dr. Boules at the health department, and he spent an hour or an hour and a half checking up on her during her appointments.  Plaintiff testified that she was not seeing any other doctors in the last two years besides the public health department.  She stated her son paid for her medications, and that she took her medication as prescribed, except that she sometimes took more Tramadol for her pain.  She stated that her medications did help her some.  Plaintiff testified that her knee pain was "sharp," but that her back pain was more throbbing, and that in her last year of working for Sonny's she started to notice the pain more and more.  (R. 70-75; 78.)

Plaintiff testified that her doctors had advised her to diet and lose weight. It was hard for her to walk  so she did not. She said that she could walk about a half a block or a block before she would need a rest break.  Plaintiff testified that she could sit for

fifteen minutes before she would need to take a stretch break, and could only lift or carry less than five pounds, because she had previously broken her wrist, which developed arthritis.  Plaintiff stated on her paperwork that the heaviest amount she had to lift or carry was fifty pounds.  Plaintiff explained that the cabbage bags at Sonny's were fifty pounds, but that the guys in the pit would usually put them on the table so she did not have to, but if no one was there she "had to struggle with it" and get her job done.  (R. 75-78.)

Plaintiff testified that she lived with her son in her apartment.  She stated that if she needed to go somewhere she would ask one of her sons, or a friend.  She said that she could prepare a simple meal for herself, but did not do too many household chores. She stated that if she bent over the sink she could wash some dishes but could not stand up straight, and she could sweep part of the house, but that her son helped her with the housework.  She stated that she spent most of her day reading and watching television, for around eight hours, off and on.  She stated that she sometimes went to visit her grandchildren, but could not watch them, at least when they were young, because she could not chase them around.  She also stated that for about the last year and a half, she no longer went to church because she could not sit that long, and the seats were hard.  (R. 75-83.)

During examination by her representative, Plaintiff stated that she had back pain all day, that her right knee would pop and go to sleep, and it hurt her every day as well. She stated that after ten minutes of standing she needed to sit down because of the

weight on her legs.  Plaintiff estimated that out of an eight hour period she could sit and

stand for about three hours, but not all at one time, and would need five or six breaks.

Plaintiff testified that Dr. Adhami never actually touched her knee, or back, but rather

only used a tool to check her reflexes.  Plaintiff testified that Dr. Greenberg spent longer

with her during her visit with him, and physically touched her knees and back.  (R. 83-

87.)

      A vocational expert (VE) also testified at the hearing.  The VE testified that

Plaintiff had past relevant work as a counter attendant, a semi-skilled light job, with an

SVP of 3.   The ALJ posed a hypothetical question to the VE. The ALJ asked the VE to

assume an individual the same age as Plaintiff, with the same educational background

and past work experience, who could sit for a total of six hours in an eight-hour

workday, and walk off and on for up to two hours in an eight-hour workday, lift twenty

pounds for one-third of the day and ten pounds more frequently, all postural motions

could be performed occasionally, but could never climb ropes, ladders, and scaffolds,

and could not work around unprotected heights or around moving machinery, and

should not have exposure to concentrated vibration.  The VE testified that such an

individual could not perform Plaintiff's past relevant work as actually performed or as

customarily performed.

      The ALJ then asked whether there were some sedentary occupations that such

an individual could perform.  The VE testified that there were sedentary jobs available

in the national and regional economies, including jobs such as addresser, and

document preparer/microfilming (which today would be scanning).  Further, the VE
stated that there were also some light jobs which offered a sit/stand option, such as
ticket seller, and cashier.  (R. 87-93.)

### C.  ALJ's Decision

The ALJ determined that Plaintiff met the insured status requirements through
December 31, 2013, and had not engaged in substantial gainful activity since July 1,
2008, her alleged onset date.  He determined that Plaintiff had the severe impairments
of: history of morbid obesity, hyperlordosis of the lumbar spine exacerbated by her
obesity, degenerative/osteoarthritis of the knees made symptomatic by her obesity, but
did not have an impairment or combination of impairments that met or equaled the
Listings.  The ALJ determined that Plaintiff had the RFC to perform sedentary work as
defined in 20 CFR 404.1567(a) and 416.967(a), except that she was limited to lifting
and carrying twenty pounds occasionally and ten pounds or less more frequently, and
could sit for six hours in an eight-hour day, and stand or walk off and on for two hours.
She could occasionally climb ramps and stairs, but could never climb ropes, ladders, or
scaffolds.  She could occasionally balance, stoop, kneel, crouch, and crawl, but could
not perform tasks at unprotected heights or around moving machinery, and should
avoid exposure to concentrated vibration.  In making this determination, the ALJ
partially credited Plaintiff's complaints regarding the disabling effects of her medically
determinable impairments, but found that Plaintiff's complaints were not fully credible.
The ALJ accorded "more" weight to Dr. Karsh's opinion and physical assessment of

Plaintiff's abilities, and accorded "no" weight the Dr. Greenberg's RFC assessment because it was completed more than a year after he physically examined Plaintiff, and "the totality of the credible evidence fails to support his conclusions."  The ALJ also did not give the February 2010 assessment of Plaintiff by Dr. Greenberg much weight because it was "internally inconsistent."  The ALJ accorded "no real weight" to a December 2008 state agency evaluator's physical assessment because it was "poorly rationalized."

The ALJ concluded that Plaintiff was unable to perform her past relevant work, but considering the Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she could perform.  These include the positions of addresser, document preparer, microfilming (which today would be scanning), ticket seller, and cashier.  The ALJ, therefore, concluded that Plaintiff was not disabled.  (R. 18-28.)

## IV.  DISCUSSION

**Claim 1:** *The ALJ Properly Developed the Record*

Plaintiff contends that the ALJ failed to adequately develop the record and it was "incumbent upon ALJ Thompson to order additional x-rays to determin[e] if Dr. Greenberg was also correct in diagnosing Plaintiff Elleby as also suffering from osteoarthritis of the lumbar spine and hips," such that she would meet Listing 1.02. Doc. 16 at 7.  For the reasons discussed below, the the ALJ did not have a duty to order additional x-rays in order to fully and fairly develop the record.

It is well-settled that an ALJ has a basic obligation to fully and fairly develop the record.[15]  This obligation exists whether or not a claimant is represented by counsel.[16]  As a hearing is non-adversarial in nature,[17] the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[18] In all such cases, there must be a showing of prejudice before remand is warranted for further development.[19]  Prejudice has been found when the record "has evidentiary gaps which result in unfairness or 'clear prejudice.'"[20]  An ALJ, however, is not required to order medical evidence to have a complete record unless the record establishes that it is necessary to enable the ALJ to render his decision.[21]

Plaintiff contends that the ALJ should have ordered additional x-rays to determine whether Plaintiff was suffering from osteoarthritis of the lumbar spine and hips.  Notably, however, neither Plaintiff nor her representative suggested at the hearing that the ALJ order additional x-rays.  Rather, Plaintiff's representative

---

[15] See Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981); see also Zaldivar v. Apfel, 81 F. Supp. 2d 1353, 1359 (N.D. Ga. 2000).

[16] Zaldivar, 81 F. Supp 2d at 1359.

[17] Id.

[18] See Mason v. Barnhart, 63 Fed. Appx. 284, 2003 WL 1793283, *2 (9th Cir. 2003).

[19] Brown v. Shalala, 44 F. 3d 931, 935 (11th Cir. 1995); Kelley v. Heckler, 761 F. 2d 1538, 1540 (11th Cir. 1985).

[20] Brown, 44 F. 3d at 935 (quoting Ware v. Schweiker, 651 F. 2d 408 (5th Cir. Unit A July 1981)).

[21] Holladay v. Bowen, 848 F. 2d 1206 (11th Cir. 1988) (concerning the ordering of a consultative examination); Kelly, 761 F. 2d at 1540 (concerning additional medical information submitted by claimant).

suggested that the ALJ followup with an interrogatory to Dr. Greenberg.  The ALJ stated

at the hearing that he did not think that would accomplish much because Dr. Adhami

also had examined Plaintiff, and had done so more than once.

Further, the record does not support a conclusion that the ALJ should have

ordered additional x-rays because there is no evidence that even if those x-rays were

ordered, Plaintiff would have met or equaled Listing 1.02.  Even if additional x-rays

showed osteoarthritis in Plaintiff's hips and lumbar spine, Listing 1.02 requires that:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by
> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous
> ankylosis, instability) and chronic joint pain and stiffness with signs of
> limitation of motion or other abnormal motion of the affected joint(s), and
> findings on appropriate medically acceptable imaging of joint space
> narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip,
> knee, or ankle), resulting in inability to ambulate effectively, as defined in
> 1.00B2b;
> or
> B. Involvement of one major peripheral joint in each upper extremity (i.e.,
> shoulder, elbow, or wrist-hand), resulting in inability to perform fine and
> gross movements effectively, as defined in 1.00B2c.
> 20 C.F.R. § 404, Subpt. P, app. 1, § 1.02.

Thus, in order to satisfy the Listing, Plaintiff had to establish that either she was

unable to ambulate effectively, or that she was unable to perform fine and gross

movements effectively.  Plaintiff's medical records demonstrate that she was able to

ambulate without assistance, and that she had no problems with fine or gross

movements.  Dr. Adhami found that Plaintiff had muscle strength of 5/5, and noted that

Plaintiff walked normal.  Dr. Adhami also specifically noted that although Plaintiff

needed a wrist brace, her range of motion was preserved, and she was able to pick up

small objects and button clothes.  (R. 291-92; 305-306.)  Even though Dr. Greenberg

found that Plaintiff had decreased muscle strength and range of motion, he noted that

she "did not require any assisting device for ambulation."  Dr. Greenberg, like Dr.

Adhami, concluded that Plaintiff did not have any problems with fine or gross

movements.  (R. 314-15.)

Although there is some evidence in the record that Plaintiff used a cane at one

point  (R. 256), this does not demonstrate an "inability to ambulate effectively."  That

term is defined by the listings as

> Definition. Inability to ambulate effectively means an extreme limitation of
> the ability to walk; i.e., an impairment(s) that interferes very seriously with
> the individual's ability to independently initiate, sustain, or complete
> activities. Ineffective ambulation is defined generally as having insufficient
> lower extremity functioning (see 1.00J) to permit independent ambulation
> without the use of a hand-held assistive device(s) that limits the
> functioning of both upper extremities
> 20 C.F.R. § 404, Subpt. P, app. 1, § 1.00.

That section further provides that "examples of ineffective ambulation include, but are

not limited to, the inability to walk without the use of a walker, two crutches or two

canes."  *Id*.  Therefore, even if Plaintiff's had established that she used a cane that

would be insufficient to satisfy Listing 1.02.

Lastly, the conclusion that Plaintiff did not meet Listing 1.02 was further suported

by the testimony of Dr. Karsh, the impartial medical expert, who opined at the hearing

that Plaintiff did not meet or equal Listing 1.02.  (R. 45.)

Thus, even if additional x-rays were ordered by the ALJ, the x-rays would not

change the fact that Plaintiff did not meet or equal Listing 1.02.  Accordingly, the

decision of the Commissioner is due to be affirmed.

**Claim 2: *The ALJ's Assessment of Plaintiff's Obesity***

Plaintiff contends that the ALJ failed to properly follow Social Security Ruling 02-1p in finding that Plaintiff is not disabled.  Social Security Ruling 02-1p guides the evaluation of obesity in disability claims, and was published following the deletion of Listing 9.09, Obesity, from the Listing of Impairments.  *See* 67 Fed. Reg. 57859, 57860-61 (Sept. 12, 2002).  The SSR recognizes that obesity is a risk factor that increases the chance of developing impairments in other body systems, including the cardiovascular, respiratory, and musculoskeletal body systems.  *Id*.  The SSR provides that the ALJ should consider the effect of obesity at each step of the sequential evaluation:

> [T]he combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately.... [A]djudicators [should] consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

*Id*. at 57861-62.

Plaintiff says that the ALJ failed to "realistically evaluate the increased knee pain that would be concomitant with Plaintiff Elleby's morbid obesity" in determining Plaintiff's RFC at Step Four thus requiring that this case should be remanded with directions to the Commissioner to instruct the ALJ to follow Social Security Ruling 02-1p.  Doc. 16.

The ALJ found that Plaintiff's history of morbid obesity was a severe impairment at step two of the sequential analysis.  Further, in evaluating Plaintiff's RFC at step four, the ALJ specifically noted that Plaintiff's musculoskeletal impairments were

compounded by her obesity, placing an extra strain on her skeleton and aggravating her pain symptoms and limiting her exertional ability.  The ALJ also relied upon the testimony of Dr. Karsh, a specialist in internal medicine and rheumatology, who "had considered Plaintiff's impairments with her obesity, and opined that Plaintiff could perform a limited range of sedentary work given her morbid obesity.  (R. 20-26.)

The ALJ also discussed Plaintiff's medical records in detail, including discussing Plaintiff's knee pain, spinal disorders, back pain, previous wrist fracture, osteoarthritis, and obesity.  Plaintiff's medical records themselves also expressly highlighted Plaintiff's obesity and its impact on Plaintiff's health.  The ALJ's RFC determination accounted for Plaintiff's obesity and her other impairments by limiting Plaintiff to light work with additional postural and environmental limitations.  (R. 21-26.)

 Accordingly, the Court concludes that the ALJ fully and properly considered Plaintiff's obesity, and the functional limitations arising therefrom, in combination with Plaintiff's other impairments in evaluating her RFC.  As such, Plaintiff's argument that the ALJ erred by failing to address Plaintiff's obesity as required by the Social Security Ruling has no merit.

**Claim 3: *The ALJ's Asserted Lack of Neutrality***

Plaintiff contends that this case should be remanded because Plaintiff was denied a full and fair hearing before the ALJ because the ALJ was not a "neutral fact finder," which violated her Fifth Amendment right to due process.  As support for this argument, Plaintiff points to data purporting to show that the ALJ, who denied Plaintiff's claim in this case, ALJ John D. Thompson, has a statistically lower-than-average rate of

favorable disability rulings compared with the statewide average and national average.

Specifically, Plaintiff asserts that "ALJ Thompson only issues Favorable Decisions in 14

or 15 percent of his cases versus the statewide average of 63%."" Doc. 16 at 11.[22]

Plaintiff's counsel previously advanced this identical argument regarding ALJ

Thompson in at least two other Social Security appeals. *See Clark v. Colvin*, Case No.

1:13-cv-31 (N.D. Fla. 2014); *Barry v. Colvin*, Case No. 1:13-cv-89-MP-GRJ (N.D. Fla.,

Report and Recommendation entered May 28, 2014.) For the same reasons the

argument was rejected there, and as explained below, the Court does not have the

authority to reverse and remand this decision simply because ALJ Thompson has a

statistically lower-than-average rate of favorable disability rulings.

There is no question that a Social Security claimant is entitled to a full and fair

hearing.  The Eleventh Circuit has held that an ALJ shall not conduct a hearing if he or

she is prejudiced with respect to a party to a case or has any interest in the outcome of

the pending matter. *Miles v. Chater*, 84 F.3d 1397, 1401(11th Cir. 1996) (*citing* 20

C.F.R. § 404.940).  The court there noted the crucial role the ALJ plays in the disability

review process, stating that "[n]ot only is he duty-bound to develop a full and fair record,

he must carefully weigh the evidence, giving individualized consideration to each claim

that comes before him." *Id.*  The ALJ's impartiality is integral to the system. *Id.*

The Social Security regulations require that the claimant present a claim of bias

at the earliest opportunity. *Miles*, 84 F.3d at 1400.  The claimant must notify the ALJ if

---

[22]The statistics relied upon by Plaintiff are compiled in the following spreadsheet:
https://docs.google.com/spreadsheet/pub?key=0AsvjxcmAioZldGM2ZDJZQlZzaF9KZDBUS3FCRDdVd1E
&gid=1

she objects to the assignment of a particular ALJ to her case.  If the ALJ refuses to withdraw, the claimant must seek reconsideration after the hearing by raising the issue before the Appeals Council.  *Id.*  "A claim of bias is waived if the claimant is aware of the facts giving rise to his bias claim, but fails to raise it in accordance with 20 C.F.R. §§ 404.940, 416.1440."  *Stokes v. Astrue*  2009 WL 2216785, *14 (M.D.Fla. 2009) (citing *Hummel v. Heckler*, 736 F.2d 91, 94 (3d Cir.1984)).

The record does not reflect, and Plaintiff does not assert, that she challenged the ALJ's impartiality during the administrative proceedings.  The statistics relied upon by Plaintiff in her brief are not part of the administrative record in this case.  Plaintiff points to nothing in the record of her administrative proceedings that suggests the ALJ was biased in deciding her disability claim, nor does the Court's review of the record reflect such bias.  While the statistics relied upon by Plaintiff may merit scrutiny by the Commissioner, it is not the province of this Court to make factual determinations regarding the relevance of such statistics to Plaintiff's disability claim in the first instance.

Separate from the issue that the statistics are not part of the administrative record, statistical evidence regarding an ALJ's claim denial rate is generally insufficient to establish bias, in the absence of other evidence reflecting actual bias on the part of the ALJ.  *See, e.g.*, *Grant v. Comm'r of Soc. Sec.*, 111 F. Supp. 2d 556, 558-59 (M.D. Pa. 2000) ("[S]tatistics in and of themselves may have limited probative value," but other evidence in the record, including statements by the ALJ evincing bias, supported plaintiffs' bias claim.)

Accordingly, the Court concludes that because Plaintiff did not raise this bias claim during the administrative proceedings and there is no other evidence of bias apparent from the record, the claim of bias based on the ALJ's disability ruling statistics is waived and foreclosed from review by this Court.  *See Hummel*, 736 F.2d at 94.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS,** in Gainesville, Florida, on the 2nd day of June 2014.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**